The District Court found a contract was formed between Adaptive and Lee because Lee affirmed that he had read and agreed to offer details to the right in a gray box to the right of the yes no icons on the left on the family safety report web page address. Lee has not challenged that finding of the district judge. And so the key question here is what did the offer details include? Well, the offer details to the right that he ascended to included the terms and conditions hyperlink and therefore the contents of the hyperlink because it was prominently located under the heading bold in all caps quote offer details colon in the same gray box as all the other offer details to the right and above the yes and no icons. Therefore, Lee had reasonable notice that the terms and conditions were part of the quote offer details he was agreeing to and that's all the law requires under basic contract law. The District Court's contrary legal conclusion that the contract Lee agreed to the offer details included only the first paragraph under that all caps heading with the colon at the end offer details and not the rest of what follows from that heading in the same gray box is contrary to the plain meaning of the words and punctuation and placement of the words. So as I read the page here, putting to one side whether or not it's properly part of the contract, even the material to the right, so I am putting that to one side for the moment. The question is whether or not when the little box to the left that says the consequence of clicking yes, that box says by clicking yes, I have read and agreed to the offer details displayed to the right, displayed to the right. Now some of these web pages say offer details to the right, leaving out the word displayed, and authorize Intellius to securely transfer my name, address, and credit card information of the family safety report of service provider of Intellius. Now the term that you're seeking to enforce is not to the right. You need to click on something to the right in order to get there. Is that right? It is under the offer details and as a hyperlink. Let's make sure that we're on the same page with this. That is to say the provision that you're seeking to enforce is not on the right on this page as it exists. In order to get what you seek to enforce, you need to click on privacy policy terms and conditions. Is that correct? You need to click on the terms and conditions hyperlink, Your Honor. That's correct. So it's not actually displayed at the right. Well, the way that courts virtually uniformly have treated a hyperlink terms and conditions is as if it's there and it's in higher contents listed there. Well, there's at least one court that hasn't treated it that way. That's just Lesnick. Well, that's why I said almost uniformly. But I think he didn't look to that law. Instead, look to the browse rap cases where there is no assent and you don't find it until after you, say, downloaded the software or whatever. But that's not a click rap case and it's not a link case. Do we have evidence in the record that tells us very much about how many people were tricked by this, thinking that they had only signed up for what was on the right and had not signed up to what they would have had to click to see? Well, we know from what the allegations were, or at least what the other side reported it to be, and I'll have to be approximate here, Your Honor. Approximately 70% of the people say no. Say no what? No instead of yes to the offer details to the right. But the people who say yes, how many of those afterwards say, I had no idea what was going on when you're seeking to enforce this? Again, don't hold me to the exact numbers there. An additional 12, 15% of that remaining piece that said yes seek a refund or cancellation. That's not the question I asked. I didn't ask how many people seek a refund. How many people after they clicked yes say, I did not understand that I had to click on the additional thing on the right and that I was also, according to your side, signing up for something that contained arbitration? I believe, again, and I don't have these numbers in front of me, approximately 80% either said no or did not manifest that they were, as you're saying, lacked an intention to say yes. Said no to what? Said no to the offer details to the right by clicking no. But you've still not answered my question. Maybe I've not made it clear. Of the people who clicked on the yes, so maybe 80% said no. Of the people who clicked on yes, how many of them were misled into thinking that they were signing up at most only for what was actually displayed on that page to the right? And I don't have that number in front of me. Is it anywhere in the record? I believe that there were, there may be subsequently in the, there were class cert proceedings that took place as to claims that don't involve the adaptive programs in this, that were brought against Intellius. And they may have been, there may be in the record on class cert, but that, I believe, followed, essentially followed this issue that the court ruled on here, which was compelling arbitration. Counsel, I think that the district court judge focused on the fact that the language says by clicking yes, I have read, excuse me, and agreed to the offer details, but not to the terms and conditions. What's your response to that? I think we have to, as the Second Circuit said in the Speck case, go back to basic contract law. And what you have is one, the equivalent of one, a one-sheet contract offer. And you go back to the heading on the right where it says it will be as offer details, all caps, colon, and the colon, plain meaning of that is everything that precedes the colon applies to everything that follows the colon. Unless, so everything in this one single gray box, which contrary to their assertion is visible, clearly visible if the court looks at the color print of this webpage. Everything is part of those offer details, colon, unless there's an equal dignity heading somewhere else in that gray box, and there isn't here. All the other headings are smaller, smaller font, no colons. They're all subparts of offer details. It's just basic, I agree to any other contract. And the notion that, you know, I would be more sympathetic to your argument if it said by clicking, I've read and agree to the offer details displayed on the right, including all things incorporated by hyperlink. But, Your Honor, that's precisely what the use of a, first, a gray box to be the entirety of what's on the right. And this heading that says offer details, all caps, colon, the purpose of the colon is to include. And the hyperlink is a, and there are courts that indicate that everybody understands that this means click here for more of the terms and conditions. You know, I just have to say I regard this as deceptive. I regard it particularly as deceptive because this hyperlink is privacy policy slash terms and condition. Nobody in his right mind reads privacy policy. Well. And you know that. Well, and as they said in the spec case, most people don't read the contractual terms. Frankly, most lawyers don't read the mortgages when they buy their own house. But the reality is one has to treat, in order for there to be e-commerce or any commerce by contract, that people read what they ascribe that they've read. Well, it's a little different here because this is kind of an attenuated agreement. The person went on to purchase one thing and then were referred to a different provider. So it's not as if this person is, has sought to buy the family safety report. That's something that came up once the purchaser was trying to complete the purchase for the information it actually wanted to purchase. So it's a little different in terms of how the contract is presented to the individual. It's kind of a, this is sprung on the person who thinks they're buying the intelligence service and service product. It's a new offer, self-contained in a single page. On the left, you have to fill in your e-mail address twice. Before and after that, it makes clear you're going to be agreeing to these offer details if you say yes. And the offer details are simply laid out. And again, if it was just the written page that you copy from it, it says offer details colon, the plain meaning of terms and conditions, the plain meaning of terms are the provisions comprising an offer or completed transaction. And conditions mean conditioning something. I would be a little more understanding of this if it said offer details from families for purchase of a different product, family safety report. Because to me, this is still indicating that you're on the same product. It's really difficult to discern that the buyer is being directed to a different product, isn't it? It's just really difficult. Your Honor, that's indicated above the offer details colon heading, where it indicates what you're going to get. And then twice on the left side, and once under the offer details, it makes clear this is from a different provider that entails the exception one report. It's not actually clear. But it's indicated three times. And I'm not sure how many more times they needed to do it. It isn't perfection that's required. It's reasonable notice. I'd like to reinforce a little bit what Judge Rawlinson is just saying. It strikes me as even quite aside from whether you're supposed to click on the hyperlink for privacy policy slash terms and conditions. Most people coming to that second page, I think, don't understand that they're now buying something other than what they already bought. I mean, they're not asked to put in their name again. They're not asked to put in their credit card name again. All they're asked to put in is an e-mail address, so apparently they can take advantage of this lovely offer. It just strikes me as a scam, frankly. Your Honor, the judge, and again it hasn't been challenged, found that there was a contract by way of the objective assent to what was offered. Issues about the existence of a contract, that was the issue for the judge, and he decided it. Did the judge decide there was reasonable notice? He seemed to indicate that there wasn't, but I think it was based. It was not, right? Reasonable notice as to the terms and conditions, but I think it was based on a misconception that the terms and conditions are a different document when the cases treat that as information pages of the same document and ignoring the colon and the heading and the fact that all the other headings are subheads of that heading. Well, I think the district court judge had some of the same concerns that we're expressing regarding how clear the notice was that this was a separate product and that the terms and conditions were part of what you've clicked on when you're getting the initial product. Well, I don't believe the court made a point of confusing the terms and conditions with anything else. Well, I think the court said that the only thing that was fairly noticed was the offer details, and if they had said offer details slash privacy policy slash terms and conditions, it would have been clearer. But the offer details include the terms, conditions, privacy, and the paragraph and disclaimer above it. Otherwise, you're left with the terms and conditions, which everyone knows means terms of the proposed or consummated transaction in normal language. Those are just gratuitous references here, and the judge apparently concluded that the disclaimer was a gratuitous reference, and that doesn't make sense. There are various layers on which I'm rather unsympathetic to your argument, but I have to say I would be more sympathetic to your argument if terms and conditions were on a separate line by itself instead of following privacy policy slash terms and conditions. A perfectly reasonable understanding of that line is this is terms and conditions with respect to privacy policy. That might be the case if it said privacy policy terms and conditions. Well, that's exactly what it says, separated by a slash. That's the key. On the same line. That's the key, Your Honor. Separated by a slash, which is not untypical in e-commerce offers. In fact, the Intellius one had the same situation on the separate product, and it said terms and conditions. Below it had privacy policy, and Mr. Lee asserted that the privacy policy hyperlink was part of the contract, even though it wasn't referenced above the yes button on that particular page. Well, but he knew that he, I mean, he was, he knew he was purchasing an Intellius product, so it was a little bit different. He was attuned to what were the parameters of his agreement with Intellius, but I'm not sure that completing the purchase for that put him, alerted him to the fact that he should be looking at the hyperlink on privacy policy slash terms and conditions or family safe report. I don't know. It's really fuzzy. Well, Your Honor, from the box itself on the single page, again, in color, it's important to look at it, it's in the box under this heading, and one would think that anything under there applies. It's one of the offer details, colon. If there are arguments about this is not cautionable or not valid, existence was for the judge, validity and enforceability are for the arbitrator, and here there's a gateway arbitration delegation provision, so everything goes to the arbitrator. That's pretty small print. I'm sorry. Pretty small print as compared to the yes and show me my report, which is fairly large print. Well, but it is highlighted, just as the disclaimer heading is, and just as the offer details colon is, and it's smaller than the offer detail colon. It is certainly, if you look at a clear color page, privacy policy slash terms and conditions are about as prominent as anything other than the name family safety report and offer details colon. Well, it's not nearly as prominent as yes and show my report. No, it's not as prominent as the yes or the no on the left side. Well, the yes is much more prominent than the no. And, again, those may be reasons that they can go to the arbitrator and say, we don't think this is a valid contract that the judge has. Well, that goes to notice as well. It does if it would not lead somebody to read what's in the gray box that on the left they're saying they're agreeing to. But you look at the entire presentation to determine whether or not there's fair notice. Right. And here it says on the left, the offer details on the right, in a single box, not something where they have to, in some cases, say, look for a trail of breadcrumbs. But right in one web page, in one box, under a single main heading, offer details colon, it includes a summary paragraph, what their counsel said to the court were the bare bones, which means there's more to come, a disclaimer, and then two links to privacy policy and terms and conditions, which, by the way- Privacy policy slash terms and conditions. And, by the way, those are almost always in virtually any contract one enters into in e-commerce. And for that matter, nowadays, it's also in non-e-commerce transactions. Let me just go back to a question that was asked some time ago. Judge Fletcher asked, well, how many other people, is there any evidence in the record about how many other people thought they were entering into such a contract? And you said you didn't know of those who had checked yes. But there is some inferential evidence in the file on that, isn't there, in that only a handful, four or five of the people that clicked yes, ever utilized the service offered. Isn't there evidence in the record of that? Again, there may be evidence in the class certification briefing on that. But the- It seems to me I recall that even among the people that said yes, very, very few utilized the service. And perhaps an inference could be drawn from that that many of them just didn't think it was worth suing or complaining about. But they never-I mean, there's almost no utilization of that secondary service. And it may be that the nature of what the service is here, which is providing information on sex offenders in the neighborhood and what have you, are not- It would only be inferential evidence. But it just seemed to me that that might be some evidence about that. There's a significant amount of money, a monthly charge. But that, Your Honor- If you're going to pay that kind of money, you would expect that a significant proportion of people would utilize it. But that, Your Honor, I think is going to not whether you are on notice as to what you're assenting to on the right side, but rather whether it's a valid or enforceable contract because of- All I'm saying is there might be some inferential evidence that other people similarly didn't realize that they were getting another service because very few of them ever utilized the other service. That's all. And, Your Honor, that would be a valid issue to raise with the arbitrator as to whether the contract as a whole is valid or some other- case, issues about even the arbitration clause go to the arbitrator. And any issues about unconscionability or enforceability or validity as opposed to the existence of a contract which the judge found already and hasn't been overtly challenged, any of that is for the arbitrator and is fair game before the arbitrator. And the arbitrator may very well end up sending it back and saying the arbitration provision or the agreement's invalid, whatever. But that doesn't affect that this single box on the right where it said to look and where you are twice told you're going to be agreeing to if you hit yes, that one would not take notice of everything there in that one box under the heading, offer details, colon, as any other contract. You're down to 26 seconds. Would you like to save some time? Three minutes, Your Honor.  I'm sorry. Would you like to save some time? I had asked at the beginning. Well, ordinarily you've got to keep track of your own time. But on the other hand, as you've noticed with the others, we'll make sure you get a chance to respond as necessary. Yeah. If it pleases the Court, my name is Paul Bland. I represent the appellees in this case. First of all, with respect to the question you were asking, Judge Eagle, if you looked at supplemental excerpts of record, pages 57 to 58, the number of consumers who clicked on the orange box who actually ever went on to use the product, the number of consumers who didn't use the product was 85 to 90%. So in terms of how many people actually thought they were getting something from this different party, that's about 10% of the people had any idea, and the other 90% paid $29 a month and got nothing at all for it. So I think that there is some inferential evidence there. Now, Judge Fletcher, you had raised a very important point, I think, where you said you would have been more persuaded by their approach if the link to the orange box had said including not only the offer details, but offer the terms and conditions. And there's a really instructive comparison in the record here. And if I could suggest that at excerpt of records 392 is the last page of the Intellius series before you suddenly change over to this next page where you're in with the anonymous party. And at the bottom of the Intellius provision... You're talking too fast. Sorry, sorry, sorry. I need to get to where you're talking about. Okay. 392, I'm with you. Okay. So there's that red box, confirm the purchase and show my report. Then underneath that, by clicking the confirm purchase button above, I accept Intellius's terms and conditions. So it's possible to do this. This isn't rocket science. There's a way to do it in which it's pretty clearly presented, and there's a way to do it that's not so clearly presented. But what's your response to opposing counsel's observation that the way it's done here with the slash links is the customary way in e-commerce? Well, first of all, Intellius didn't do it that way. It's not customary. But I have several responses, if I may, Your Honor. First, my friend here keeps referring to a gray box. If you go back and look at ER-598, which is the most legible of these things, so you've got a box at the top. A box is a line around something that incorporates all the text, right? A box tells you all of this stuff is together. So you've got a box at the top with this blue label and a line around it. Then you've got a box to the left with the green thing at the top and then the big orange button saying yes. This gray stuff to the right, there's no box, okay? If there was a line that included the terms and conditions with the offered details, then you would have a box. But there's an imaginary box. You keep hearing the word box, but there's no actual box, all right? Has the law gotten to the point that you win if there's no box and you lose if there is a box around it? Well, you know, the law turns on whether there is a reasonable notice that somebody is agreeing to an arbitrate. And here they're going down to. But I have a bunch of different factors I want to point to, but one of them is since we've heard so much about it. You're just responding to the fact that he said it was in a box. He's saying that there's a box and there's not. There's a couple of other things. The idea that this is all pulled together by gray, I don't have the world's best eyesight, but as I look at ER-598, I find it almost impossible to determine that there's gray and if anything it doesn't look like the gray actually covers the terms and conditions link. Another point that's really important. Well, it's kind of beige and it does cover. If you say. I find it difficult, but I'll take your word for it. But let me take something else about the terms and conditions line. That is a tricky line for two reasons. First, terms and conditions was on the last page of the intellis line. Now, this page, 598, has intellis's logo up here. You still think you're dealing with intellis. There is no place on this page that has the name of Adaptive or the name of any other company. So there's a lot of redundancy built through these. This is the eighth screen that you get to, the eighth screenshot. So on the number of the previous screenshots, there's redundancy built in. So there's several different times they'll say, do you want the $39 report or the $49 report? You click another screenshot. Do you want the $39 report or do you want the $49 report? So back to page 392, Your Honor, that I was talking to a minute ago. It's intellis and says, here's our terms and conditions. Then you go to this next page, the final page, and it refers to terms and conditions. You think you've already seen that. You think you saw it on the screenshot before. Why would you click on it again here when it's the exact same thing you saw before and there is no indication that there's a different name? Well, and when it's on the same line and following privacy policy terms and conditions. Exactly. Exactly, Your Honor. I think that's a very important point. Let me ask you a different question, if I may. Your adversary says that you are not challenging in this appeal another possible ground on which you might prevail, and that is that the entire contract, even including the terms and conditions that we see on the screenshot shown on 598, is not an enforceable contract because of the deceptive nature of the way that you've been led to that page. We did not cross-appeal the district court's holding, but this court could affirm on a variety of reasons beyond what the district court had held, and we have argued very vehemently that our clients do not have any contract with Adaptive in particular. So, for example, Adaptive's name does not appear on this screen, and if you had clicked on the terms and conditions, by the way, another reason that it's tricky is that the document you'd go to would be called membership agreement. The document isn't even labeled terms and conditions. If you went through the entire six-page membership agreement, which is in the record. Now, before I lose the thought, I need to ask you this. You've not cross-appealed, and of course I understand that we can affirm on any ground. Have you argued to us that we could or should affirm on the ground that there was no contract entered into at all with Intellius? Yes, we have. Excuse me, with Adaptive. I'm sorry, with Adaptive. Yes, we have argued that. And the point that we make in particular is that when you have a contract, there has to be a reasonable amount of definiteness. And one of the factors that you need to have a reasonably definite contract is you have to be able to identify who the parties are. So we cited to this court a case from the Washington Supreme Court from a couple of years ago called Pacific Northwest Shooting Park. And what the Washington Supreme Court said in that case is if you're trying to determine what the relationship is between parties and whether or not they have a contract, one of the things you have to know is who the party is. They have to be sufficiently definite. So if you clicked on the terms and conditions line on the last screenshot, what you would get is this membership agreement. The membership agreement never gives Intellius his name. Excuse me, never gives Adaptive his name. I led you into that. And it never identifies them. All it identifies them as is we, or at one time us. Where is that in the record, the membership agreement? You were getting ready to tell us. It is at ER 478, and it goes about six pages. Okay, thank you. And so it's an anonymous party. Now, one of the things that my friend here briefs quite energetically is the idea that, well, there's supposedly a clear and unmistakable delegation to the arbitrator to decide all these things, and that lets Intellius, who is the only party we sued. We never sued Adaptive. We sued Intellius. We got a district court ruling that said that Intellius has no contracts to arbitrate. Intellius did not note an appeal. Now, they filed this appellee's brief, and this is a case which they lost. They filed an appellee's brief, but they did not note an appeal. So Intellius is not here. They have no standing here. The only question is, does Adaptive have standing to come in and try to enforce an arbitration clause against our clients on behalf of a non-signatory to the arbitration clause? And we have argued that there's no contract at all, to get back to Judge Fletcher's question, because there is no definition of who the party is. You can't find the name of Adaptive. One of the things that happened in this case, one of the parts of the scam, is that when you start getting something on your bill, you can't find out who it is who's billing you. And actually, there's in the record, in their brief, that Intellius is barred from telling the consumer who Adaptive is or anything about Adaptive. Their phone people won't give you that answer. Adaptive is an anonymous party. There's no contract. When you read the entire document, when it says we and us, there is no place in that entire document where the name Adaptive appears? That's right. I'm asking a broader question than whether it says we and us means Adaptive. More broadly, the name Adaptive does not appear anywhere in that document. That is exactly right, Your Honor. And what they're trying to say is that because it says we, including anybody connected with us. But we don't know who us is. That's exactly right. So we argue that an additional ground for affirmance is that there is simply no contract whatsoever because of that vagueness issue and that part of it. Moreover, we argue that an additional ground for affirmance, and this goes back to the Kramer case that was discussed so ably in the previous argument, that Intellius is a non-party. The only party we've sued here is Intellius. We do not sue them based upon the contract with Adaptive. So this marketing agreement that Judge Rollinson, you just asked me where it was in the record, has nothing to do with this complaint. This complaint is not saying anything about that. Now, if we were here, if what we were doing is we were standing up and we were suing Intellius for supposedly breaching the marketing agreement, then we would be subject to equitable estoppel. You could say, well, look, you're trying to have it both ways. You're citing this document, but then you're not trying to admit the arbitration clause in it. We're not trying to have it both ways. We're suing Intellius for Intellius's own behavior. Then Adaptive shows up several years in this litigation, after this case has been litigated like crazy, and Adaptive suddenly says, well, we would like to arbitrate. And Intellius doesn't actually move to arbitrate. How does Adaptive get into the case? Intellius cross-claimed, filed a third-party cross-complaint against Adaptive and basically said, you have to indemnify us. This is federal court, so it's a 14-impleader. Is that right? I guess that's right. I was brought in later, so I don't have that in my mind. But it's labeled a third-party complaint on the court's docket sheet. Rule 14 impleaders. Okay, so they're brought in under Rule 14, and then what happens? And so then they move to dismiss the case against – they move to dismiss Intellius's claim against them, and then they also get engaged in a whole bunch of discovery battles that go on. Now, the certiorari grant in the Concepcion case – Now, did you ever amend your complaint to add – No. So why are they still here? I mean, why are you guys still fighting? Well, that's an excellent question, Your Honor, because Intellius did not note an appeal. We feel Adaptive has no right to be here to make an appeal. Now, what Adaptive says in their brief is that a logical consequence of us winning our case against Intellius would be supposedly to void Adaptive's membership agreement. And therefore, they have standing to try to force us to arbitrate with a party we never agreed to arbitrate with. Let me understand the pleading. You filed suit against Intellius. Yes, Your Honor. Intellius brings in Adaptive under Rule 14. Yes. Adaptive does not file anything back against you as the first-party plaintiff? That's right. And do you file anything directly against Adaptive? We ask for discovery from them as a third party, and they fight the discovery, and we fight back. Did you amend your complaint to make any claim against them? No, we did not. And they made no claim against you? That's right. So why in the dickens are you here? Well, I think that is another. I mean, I think this goes to the non-party issue that they're simply not standing here. We did make a motion to strike Intellius. Well, this is a party not for a contract, but this is a party to the lawsuit. Right. I mean, their argument is that they are a necessary party because supposedly if we win against Intellius, that voids the membership agreement. Did they move under Rule 19 or Rule 24? No, they simply have argued it in their brief. So they have not made any motion to intervene as a defendant? They are not against us, no. They have made no cross-claim against the plaintiffs. They didn't. The first time that they filed something against us was to move to compel arbitration. And Intellius actually did not move to compel arbitration. Arbitration of what? Of our claims against Intellius, essentially. And we argued vociferously they don't have the grounds to do that because Intellius is not a party to this arbitration clause and we don't have any beef with Adaptive at all. We haven't sued them. We aren't asking for anything from them. But the district court ended up focusing on the formation issue and didn't decide on that alternative issue. But I think Your Honor would be entirely correct to dismiss this appeal on the additional grounds that Adaptive simply has no grounds to be here. If you look at the complaint and we asked for various levels of relief, there's nothing in the relief that would somehow void Adaptive's membership agreement. Did Intellius, though, adopt the arbitration claim of Adaptive? They did not file a motion, but they ended up filing a paper, which I think had some label something like a non-opposition to arbitration. But then I have to say that in candor the gist of the brief very strongly did argue in favor of arbitration. So at least through its brief, Intellius is asserting in this case in its litigation with Lee that it is basically a third-party beneficiary, I guess, is adopting the arbitration claim that Adaptive was asserting. They have briefed that, Your Honor. That's correct. My argument that that's not enough is they did not note an appeal with this court. So they have a district court finding that they have no right to arbitrate, holding against them, denying any motion to compel arbitration for them. They do not note an appeal. They are just sort of slipstreaming along behind Adaptive. And then they file an appellee's brief in which they say, well, we more or less agree with Adaptive. So they didn't bring a separate appeal but adopted or agreed with the Adaptive appeal. Yes. They filed a brief. And I have to say, Your Honor, my understanding of appellate procedure is it's not enough to file a brief saying we agree with someone, that if you think the district court made a mistake, you as a party have to actually file a notice of appeal yourself. You can't have someone else sort of represent you filing an appeal on your behalf. I think there's an enormous standing issue here, and that Adaptive, whose Adaptive is coming in and suing on behalf of a non-party with whom our clients never reached any sort of agreement, that that's really troubling. So have your clients or is it contemplated that your clients will ever seek any monetary relief against Adaptive? That is, we have no, I mean, we didn't reach a point of filing a written stipulation. I think in retrospect, in hindsight, I think that might have been a clever, smart thing to have done and the district court would have been to have filed a stipulation that you're not going to be suing against Adaptive. But we are entirely suing Intellius. Adaptive just came out of bankruptcy, among other things. We are entirely suing Intellius. The arguments are that we had a relationship with Intellius. Our clients didn't know who Adaptive was for a very long time anyhow because it's the anonymous party. You know, it's we or us, but it doesn't have a name or an address or a website or a link that you can find through these things. We've only brought claims against Intellius. That's the only party, and they didn't even move to arbitrate. They just sort of filed a brief that said we don't mind when Adaptive filed a brief. But we have, there's no grounds for equitable estoppel around this. And this also, I want to make very strongly an argument. This is an issue, this non-party issue is an issue for the court. In the Kramer case that this court just decided a little while ago between Toyota, so basically the plaintiffs had sued Toyota, the manufacturer, and said the brakes on our Priuses don't work. And the car dealer, the Toyota dealership, so I'll have the name Toyota and the name of the dealership, had arbitration clauses. And so what the Ninth Circuit found in that case, it was a different panel, but this court nonetheless found was that just because the consumers had an agreement to arbitrate with one entity, which was the car dealers, did not mean that they had an agreement to arbitrate with Toyota. And they said it was an issue for the court because issues about how broadly the arbitration clause sweeps and so forth are always for the court except, and the big exception comes in the Renner Center case and an earlier case called First Options. The exception is if there's a clear and unmistakable delegation of authority to decide an issue to the arbitrator. So it is for the court to decide unless there's a clear and unmistakable delegation for authority. And does that delegation have to be specific then? Yes. Yes, that's one of the elements of clear and unmistakable in the case law that defines it. You know, I actually litigated the Renner Center case and I wrote the briefs, and I don't remember a name of a case that says that, but that's clearly part of what is defined as clear and unmistakable in the case law, Your Honor. And so here, their argument is that there is supposedly a clear and unmistakable delegation to the arbitrator to decide this in the paragraph that says, we or us and anyone connected with us. The idea that that's a clear and unmistakable delegation, I think, is a complete abuse of language. You don't even, again, this goes back to the point I made. Made more ambiguous when you don't know who us is. Exactly. Exactly. It's so indefinite when you don't know who us is. And then what connected means. So they say, well, it's connected because you say that Intellius and Adaptive have a business relationship. Well, according to them, anybody who clicks on the orange box also now has a business relationship with Adaptive because you've now paid for something in perpetuity. Are they saying that if there were claims between the class members, that that would be something that's clearly and unmistakably for the arbitrator to decide? I think that's a clear abuse of it. Moreover, the issue of whether or not you've agreed to arbitrate with a party, with a different party, is always an issue for a court because it goes back to formation. In the Granite Rock case, the famous Supreme Court case from 2010, Justice Thomas wrote the opinion that says that formation of agreement is for the court on all occasions. But the case that links it into this non-signatory issue, really, I think, is the Stolt-Nielsen case, which they cite in page three of their reply. So this is a case in which the plaintiffs had sued a big shipping company and said that they violated the antitrust laws. And so the arbitrator said, well, since the named plaintiffs have sued and they have an arbitration clause with them, we can let them have a class action because all these other people also have arbitration clauses with the shipping company. Justice Alito for the Supreme Court said no, that was not enough, that with whom you agree to arbitrate is an essential issue that goes to the formation of the agreement. So when we say we have no agreement to arbitrate with Intellius, who's the only party we've sued, who's the only party we have a claim against, and we don't, whether or not we have an agreement for adaptive, we have a second line of arguments we can win this case on that we have no agreement of adaptive anyhow. But even if we lose that first point and you find that terms and conditions is included in offer details, we still nonetheless independently should win this appeal because our clients never agreed to arbitrate with Intellius, who's the only party we've sued. And what the Supreme Court said in the Stolt-Nielsen case, and then in that case they quoted an earlier case called the Waffle House case that was written by Justice Stevens, that who you agree with is an essential element of forming the contract in the first place. And whether or not there's a contract formed in the first place is always for the court. You cannot show up in court with a forged document or some crazy thing that no one agreed to at all and say, well, there's an arbitration clause in there, the arbitrator will decide that. This goes to whether there's an agreement at all. Thank you very much. And whether there's an agreement at all ultimately asks whether there was an intent to agree. Yes. Okay, thank you. Very brief, Your Honors. Why don't we put three minutes on the clock and see what happens? Thank you, Your Honor. The judge found there was a contract because of objective manifest assent to the offer details. There's no clear that you're only showing or overt challenge. I have to say I'm having trouble with how you are here. You were brought in under Rule 14, is that right? There was a cross-complaint brought by Intellius essentially for indemnification. Now, wait a minute. We're in federal court, right? Yes. And was it Rule 14? Yes, Your Honor, third-party complaint. Yes, that's not a cross-complaint. A cross-complaint is against a co-defendant, which is important here. I'm trying to figure out if you were ever sued by these plaintiffs. We were not. I would say conspicuously not since they say we're jointly marketed. So they sue Intellius. Intellius brings you in under Implied or under Rule 14. Yes. And do you make any claims back against the plaintiffs? No, Your Honor. Do the plaintiffs ever make any claims against you? No, Your Honor. So why are you here? Because they agreed in the contract the judge found below, they agreed that they would arbitrate and they're a party to the arbitration agreement, assuming the offer details. Whether they agreed to anything or not, they haven't sued you and you haven't sued them? They agreed to arbitrate any claim arising out of the contract with the provider of family services. But until you're a party with either suing them or defending against a suit by them, I don't understand why you're still here. Your Honor, here's the key. And it's against us or anyone connected with us in their complaint. The only claim they have left in the case is one based on establishing that that contract the judge found below is not valid and enforceable. Because if it's valid and enforceable, they have no claim against Intellius relating to our transaction. That's the only thing in the case. They conspicuously didn't sue us, perhaps to not want to be here for arbitration. So they're not seeking any relief against you? Not directly. What do you mean not directly? Well, against Intellius, who's then seeking indemnification from us. But they agreed, the bargain reached under the contract agreed under the offer details is any claim relating to the agreement, whether against us or someone connected with us, their own complaint makes it clear they say we're connected, they say we're partners in joint marketing of this. Is Intellius dropped out of the lawsuit? No. They are the defendant and they have agreed to arbitration. So the two parties to the arbitration agreement have to arbitrate. And that party has agreed to arbitrate and had a right, third-party right also. So there's no issue that it's appropriate to go after, to have arbitration with these parties. And if they have an issue, that because of the gateway provision, they have to raise that with the arbitrator. And that goes to the bigger issue here, Your Honor. Now, Intellius tried to piggyback on Adaptive's appeal here. At the district level, did Intellius ever state unequivocally we demand the right to arbitration? They said unequivocally they agreed to arbitrate this dispute. Not that we've agreed, but did Intellius argue that Lee agreed to arbitrate with Intellius? I believe the reading of what they had said was that in joining arbitration, they understood that there was a right. That's pretty critical. That's part of the issue, isn't it? So you just believe it or do you assert unequivocally that Intellius at the district level specifically argued to the district court that Lee agreed to arbitrate with Intellius? They, in effect, joined our motion to compel. So they filed unequivocally a joinder of request for arbitration, and you say that inferentially meant then that they are asserting a right of arbitration against Lee. I don't recall how they captioned the document, but what they were doing in support of our motion to compel arbitration was to say, and yes, we will agree to the arbitration as well that you assert we have a right to enforce against them. But any of these other issues, Your Honor, of the parties or it's not that they think this wasn't a sound or enforceable or valid contract, the existence of which the court already found below, it's all for the arbitrator. And that, under the legion of case law in our briefs, and where you have a gateway arbitration provision under the MOMO decision of this court, and this uses the same language as that decision, it's required to go to the arbitrator unless they challenge that provision specifically under the Renicar Supreme Court decision, which they haven't done. It all comes back to, because there is a contract, they haven't shown it's clearly erroneous. These other issues are for the arbitrator, and they are free to bring those up. It all comes down to what do the offer details include, and I don't think the fact that there's not a border around the gray box doesn't mean the gray box isn't there. It's clear as a bell and distinguished from everything else on the page as a result. There's no question that the offer details colon heading, and there's plain meaning to the rest of the cover. We're now back over ground that we've gone over. And I think it's important at the end of the day that it be brought back to basic contract law and these issues about unconscionability or enforceability of the overall agreement not get in the way of that analysis. Okay. Thank you, Your Honor. Thank you, both sides. Lee versus Zantelius now submitted for decision.
judges: Ebel, Fletcher, Rawlinson